My name is Robert Wilson, and I'm here representing the appellants McPherson's Inc. and McPherson's Property Management Inc. I'd like to reserve five minutes for rebuttal. Keep track of that. You see the timer there? And I'd like to point out first that in this real estate antitrust case, the Windermere appellees expressly intend to, quote, put competing real estate companies out of business, close quote. They engage in concerted refusals to deal, refusals to cooperate, including group boycotting, and refusing to show non-Windermere listings. They agreed to, quote, market Windermere listings over any non-Windermere listings, and they exclude outside competitors, including the appellants, from essential multiple listing service information by what they said was, quote, dibbling the system or cheating the system most of the time. They do this by keeping pocket listings and withholding timely and accurate multiple listing service information. All the statements that you – all the representations that you're just now listing, making for us, is all of that documented in the record that the district court judge considers when the district court carries the various motions on summary court? There is some question about what exactly the district court considered. And that related to the appellant's motion under Rule 56F for additional time and discovery to file some of those declarations. I'd like to – I appreciate the opportunity to clarify that here. One of the issues on appeal is whether the district court erred in excluding some of the record and considering other parts of it. Can you state that, Court? You have to be clear, because she did that – she made 56F ruling with respect to various motions along the way. That's correct. For example, by the time she gets to the – as I understood the record, the motion dealing with the antitrust claims, she excluded or she stayed your counter motion for summary judgment. And all the documents – and there had been a stay on discovery and whatnot by that time. Yes. There were – So there are various 56F rulings in connection with various motions. That's correct. Basically, there were three summary judgment motions, two on supplemental state claims, and the third on antitrust injuries. And on each motion, the appellants asked for additional time and discovery, for example, because their summary judgment response was due before scheduled depositions and before the appellees had answered their discovery. It's an appropriate use of 56F, particularly in those supplemental state court claims. I think the critical motion was on the antitrust injury motion. We made a timely 56F request. And before that ruling was made on the 56F request, all of this evidence was submitted. And that's what's curious. The other thing, not only was all the record evidence submitted, but the appellants filed their own cross motion for summary judgment determining liability. And as this Court has held in the Fair Housing Council, the Court has an affirmative duty to consider all the evidence in support of and in opposition to the first motion and all the evidence in support of the cross motion before ruling on either or both. And so the Court has an affirmative duty to that, and we believe the Court's failure to satisfy that duty is error. In this Court's American Add case, the – I guess it would be American Add 1, not the antitrust standing case, but the earlier substantive case. In American Add, under less compelling circumstances, and in the absence of a cross motion, in the absence of a 56F motion, this Court reversed the district court's refusal to consider evidence, including an expert declaration that was not submitted on summary judgment. This Court determined that to whatever extent the failure to file the evidence was an error, it was merely a formality, and the plaintiff there should have been given an opportunity to remedy that error. The Court then held that there was sufficient evidence showing issues of material fact, quote, even though all of it may not have been properly presented on summary judgment, close quote. Here, by direct contrast, all of the summary judgment evidence, including the expert declarations, were properly presented before the Court even considered the 56F motion. And the evidence was properly submitted in support of cross motion. Well, weren't those declarations submitted in conjunction with the counter motion for summary judgment? They were submitted in opposition to the antitrust injury motion and in support of? When were they filed, though? Yes. They were filed as I understood them. Now, you can correct me, because it's hard to follow this record. But as I understood it, they were filed in connection with the cross motion for summary judgment. So they may have been in support of the cross motion, but they also were, when they were filed and the content of them, they also would have opposed the counter motion. But I thought the concern on the district court's part was that they were filed later in connection with the cross motion. Is that right? In a sense, yes. The appellee. Well, don't tell me in a sense, either am I right, is my understanding of the record correct or not correct. If I'm mistaken and you file them in a timely manner under the local rules in opposition to the defendant's motion for summary judgment on antitrust claims, tell me.  They were filed in opposition to the appellee's summary judgment motion. The question is when were they filed. They were filed, well, there's a series of dates from September 16th to October 10th. Now, remember. They still haven't answered the question. They're going in. I'm not going to. I'm sorry. The answer to the question is they were filed in opposition to the appellee's summary judgment antitrust standing motion. They were also in support of the cross motion for summary judgment. So they were both. They were filed two times. No. No. They were each. They were filed once in opposition to the antitrust injury motion and in support of the cross motion. Okay. When? Again, they were filed between September 16th and October 10th. September 16th. So sometime between September 16th and October 10th they were filed. Okay. Yes. They were filed with a timely 56-F motion. It's not as if we simply ignored any time limits. We made a timely and proper 56-F motion, and then before that ruling occurred, before it was even heard, the evidence was filed. So we also believe that the district court misapplied the standard for the 56-F motion. The court there or the court here said the test was whether the plaintiffs had had years to do antitrust discovery. Even under that standard, the assumption was incorrect because the record shows that there was not years to develop it, but simply six months. But, in fact, the test is whether the party has diligently pursued discovery and can show how the additional evidence precludes summary judgment. There is no authority in this or any other circuit that I have found where there's a denial of additional time to file summary judgment evidence where the evidence actually exists. All the cases I've found refer to requests for additional or as yet unasked for discovery. Here we had pending discovery, which we advised the court of, and we actually had the evidence. We were getting signatures to the declaration to file in opposition to the antitrust injury motion, and they also supported, because as we'll get to, they supported the per se claims and supported our cross motion. Let me ask you this. Had there been a Rule 16 scheduling order in place? Yes. And did it set out certain dates for initiating discovery and completing discovery and filing dispositive motions? Yes. And at the time, let's just take the antitrust injury cross motion, the motion for summary judgment by the defendants. At the time that motion was filed, under the scheduling order, was discovery still permissible? Yes. There were still two months for discovery. Of discovery. And there were still three months for filing dispositive motions. Okay. And so when they filed the antitrust motion for summary judgment, that is the defendants, you asked for a 56F request to delay ruling on it so that you could, you needed to obtain additional information in order to show the district court that there was a genuine factual dispute. Yes. All right. Now, you just said a minute ago that you already had the evidence. We have. I don't quite. Yes. We have the evidence. We filed the evidence as of record before the Court even heard the 56F motion or ruled on the 56F. And as I say, there is no authority for denying existing record evidence on a 56F request. All of the 56F cases involved. Well, if you had the evidence, why didn't you just file it in a timely opposition to the motion for summary judgment? Why do you need a 56F request? That's what I don't understand. It's very confusing. And that's explained in some detail in the record, and we've cited that record in the brief. There were reasons why the experts did not have all of their information necessary for their reports. Matter of fact, the expert reports weren't even due yet for another month. Again, you're talking about under the Rule 16 scheduling order. Under the scheduling order. Go ahead. And the additional declarations were from outside industry witnesses, not the plaintiffs. And so we simply said, here is the evidence we have. Here's the discovery we've asked for. Here is what we expect to get in these declarations. And not only did we ask for that, we actually filed those declarations before the 56F motion was heard. Let me go real briefly through that time frame. On September 23rd, the Court found sufficient facts requiring the joinder of 25 new corporate appellees. On October 28th, the Court found that the appellants were entitled to complete discovery against those new appellees. On October 29th, the Court found sufficient facts for extending the time for expert reports to November 8th. Ironically, the expert declarations had been filed a month before that November 8th deadline. On November 27th, the Court finally granted summary judgment before denying the 56F motion, actually in the same order, but granted summary judgment dismissal before considering or before ruling on the 56F motion. We think that because there were sufficient grounds for amending the complaint for joining 25 new appellees, for compelling discovery against those appellees, for extending the time for expert witnesses, there were also sufficient grounds for additional time under 56F, apart from the Court's duty to consider the evidence submitted in support of the Cross motion. Why would all of that – let me ask you this. Get to the merits for a second. Why would all of that additional information help you establish that there was a genuine factual dispute with respect to the antitrust standing injury claim? Sure. Problem or issue. Yes. And the appellees limited their argument to antitrust injury, one of the elements of standing. But in that evidence were statements, express statements by the appellees that they – of their intent to, quote, put competing real estate companies out of business, close quote. As a competing real estate company, the appellants are the direct targets of that. The appellee's express objective was to control the market, control the sales agents, and control the fees or commission rates. The – one of the declarations came from a former sales agent of two of the defendant or two of the corporate appellees. He described their express agreements to, quote, market Windermere listings over any non-Windermere listings, close quote. Another insider, a former agent or former manager of one of the appellees, confirmed that the agreement was to, quote, feature other Windermere companies' listings over the listings of any non-Windermere companies. They also described the agreements for punitive commission splits, where if a listing – if a real estate listing outside of the network had a discounted commission, the appellees would impose a punitive commission split, and that was in furtherance of their price fixing agreement, an agreement to eliminate all discounted commissions. And they were going to accomplish that by not dealing with discounters. Is that correct? That's right. By refusing to deal and cooperate with competing real estate companies, including – Non-Windermere affiliates. That's right. Also to boycott those non-Windermere companies. Also to raise the cost to those non-Windermere companies. And all of those – the expert evidence indicates that all of those efforts were in furtherance of the price fix, the agreement to eliminate discounting on the commission rates. Mr. Wilson, you've got about three minutes left. Are you going to reserve any time for rebuttal? Thank you. I will. Thank you, Your Honor. Good morning. My name is Matthew Davis, and I represent the appellees. I would like to address the issues in the same order that we did in our brief. And the first is the Court needs to determine the scope of the record. And the trial court was – Keep your voice up, okay? The trial court was abundantly clear in its order about expressly what it considered and expressly what it did not consider and the reasons for that. And that's found in the excerpts of record 1136 to 1137. The Court at length went on to each document that was filed and when it was filed and why it was late. The order – the Court entered an order striking untimely evidence. The appellants have not even appealed from that order. It's not part of their excerpts of record. It's not referenced in any of their briefs. The Court denied reconsideration in its summary judgment hearing. And, again, the appellants do not mention that aspect of the order at all. Instead, the Court – the appellants say that the Court refused to consider the evidence. That's not what the Court did. The Court struck it, entered an order that is not on appeal before this Court, and that order is reviewed. And that was evidence in connection with which motion? I can't remember. You would have to, I believe, Your Honor, conclude that most of that evidence was submitted in opposition to the motion. And the reason that I say that – Well, the antitrust – In opposition to Windemere's antitrust motion. Okay. That motion was filed. The response date was September 16. About three or four documents were filed on September 16. More trickled in on the 17th. More trickled in on the 19th. More trickled in on the 25th, the 27th, October 5, October 10, and October 15. They filed their first alleged cross motion on October 10, I believe. That was stricken as overlength, and I believe the second one was filed on October 15. But at the time most of it was filed, it could only have been filed in opposition to our motion because that was the only motion that was pending. If Mr. Wilson's recitation of the various dates in the proceedings is correct, it seems like the district court was in a hurry to get all of these things done way ahead of the date set in the scheduling order. That's actually not true, Your Honor. The court, I think, was tired of dealing with instance after instance after instance of noncompliance with any of the rules by the plaintiffs. I recall one conversation where the court said, Mr. Merrick, do you even have a copy of the local rules? Is it true in effect that the discovery was closed two months before the discovery cutoff date? It's interesting. I don't recall the second discovery cutoff, Your Honor. The first discovery cutoff, as I recall, was May 29 or June 5. What happened is we had a scheduling conference and the judge said, okay, plaintiff, you want 110 depositions. You haven't convinced me you need that. Here's the initial round of discovery. You guys go do your 10 depositions in your initial round of discovery. That's May 29 or June 5. After that, come back and tell me. Bring a motion if you need more discovery. That deadline had long since passed. McPherson's had already taken all 10 of their depositions before we brought our motion. McPherson did not, did not bring a motion asking the court to take more depositions. McPherson submitted a set of discovery requests that we answered, and then they submitted a second request, and at that point we objected, saying you guys cannot ask discovery requests that are so incomprehensible. That went before a motion to judge Peckman on a motion to compel. She struck their first motion because they completely ignored the local rules that she told us to comply with. They brought the motion again, and she said you have asked way too many interrogatories. You can't have one interrogatory that says please describe all of your business plans and all of your business theories and all documents relating to it and any discussions you might have had. That's not one question, and it's not a question that can be answered. So she never granted any of their motions to compel. What she did is she said we have talked about summary judgment from day one. This summary judgment motion has been timely filed. You have a deadline to respond. And, you know, I think the other thing that probably, and she probably did to a degree lose her patience, but here's an odd question for you. The plaintiffs have this evidence in their hands. They have a deadline of September 16th to file their response. And on September 16th, I'm looking forward to a big response because I have three days to prepare my reply brief. So on September 16th, I get a stack of paper about this thick, and I'm thinking great, this is it. So I start looking through it, and what I find is this much is the response to the motion for summary judgment. This much is their motions to compel. Now, why is it that they had time to draft new motions to compel, which could have been I don't understand it. Then they file this request for a Rule 56-F continuous, and that needs to be addressed because in this circuit, and in every court in the country, I believe there are requirements for a Rule 56-F motion. You have to file an affidavit, and you have to say, Judge, this is why I haven't been able to get the evidence. This is what I think it means. This is what I think it will do. They didn't do it. Their request was so short that I put it on pages, the complete request on pages 31 to 32 of our brief. And all they do is make these conclusory statements that, gee, we need more time. Well, that's not sufficient under the law of this circuit to even state a ground for a Rule 56-F continuous. If you've already got the evidence in your hand, and you're saying, Judge, I need more time to present it, then you would bring a motion for the court for an extension of time, which I believe Rule 6 would permit, to say, Judge, we need more time. This is a big case. We've got all this evidence coming in until we have an extra week. They didn't do that. They simply filed document after document after document without any explanation, without any motion. And the argument, if you accept it, well, if you accept it, you should publish it, because it would really, really create a new procedure that I think a lot of us defendants would appreciate, and that is, after the deadline for my summary judgment motion, if I come up with more evidence, I can just file more evidence and then file a Rule 56-F request. And since the evidence exists, how can you not consider it? In fact, really, as a practical matter, when I'm moving for summary judgment, after I see the other side's reply brief, there's usually a lot of things I'd like to say and a lot more evidence I'd like to bring in. So if you're going to open the door for me to do that as a substantive right, that would be wonderful. But what about the moving party? Does the moving party get to file a new reply brief after every single new bit of evidence comes in? When does it stop? Well, when it stops is September 16, because that was the deadline in the rules, and the Court was acting well within its discretion when it said, gentlemen, we have rules. You are the ones that brought Windermere to this party. Don't blame Windermere if you can't prepare to provide this information. Now, these witnesses that they're talking about, these declarations after the fact, it's not like they were surprises. There's no evidence they didn't know who those people were beforehand. There's no explanation as to why they couldn't get them. So, no, there is no basis for a Rule 56F continuance. There is no basis whatsoever to find that the Court abused its discretion in saying, gentlemen, I told you in our initial conference I enforced the rules. I told you again, and I'm going to enforce the rules. Now, there's one thing that I do have to point out, and this probably contributed slightly, again, to the Court's unhappiness with this case. The declaration of Christopher Osborne contained an excerpt of record 800-804. The plaintiffs filed that case twice down below. The first time they filed it, we brought a motion to strike. We brought a motion to strike, A, because it was untimely, and we also brought a motion to strike because the facts signature page did not match the original signature page that they filed. Not at all. So what did the plaintiff do? They filed it again. And we objected again. So in this case, on appeal, what is it the plaintiffs have done? They cited it in their brief, and they made it part of the excerpt of record. What did we do in our response brief? We pointed out once again that this is not the evidence you say it is. So what do they do in their reply brief? They cite it three more times. And then Mr. Wilson stands up in front of you and talks about violating multiple rules and withholding information. Well, that's the evidence of that. Mr. Wilson might be able to explain it to you in rebuttal, but he's never, ever explained it to us. Now, if I can deal with the substance of this appeal, and that is the question of antitrust entry and whether or not any more discovery can change the nature of the relationship of the parties, then I think that we can understand in part why the court wasn't inclined to consider more because this is the single most basic element of an antitrust case. And as luck would have it, American Ad, which Your Honor wrote, is the case that we all agree is the lead case on antitrust injury as a part of antitrust stand. And this court stated so well in American Ad 2, plaintiffs sometimes forget that the antitrust injury analysis must begin with the identification of the defendant's specific unlawful conduct. Now, you've heard and you've read lots of conclusions, boycotts, price fixing, abuse of this, abuse of that, but you haven't seen any evidence. Even if you consider the late filed materials, there is no evidence of any group boycott. Now, Mr. Wilson just got up and told you that Windermere admits that its express purpose is to put competing companies out of business. You heard that. That is contained in the Declaration of Jerry Jackson. Jerry Jackson is not and never has been affiliated with Windermere. He owns a competing brokerage. And he said, basically, in my opinion, the express purpose of Windermere is to put competing companies out of business. A plaintiff in an antitrust case can't get another competitor to come in and say, it's my opinion that their purpose is to put us out of business and say, voila, we have evidence. And we went into great detail in our brief to look at the evidence they cited and say what they say it says. Even if you were to consider the late submitted evidence. It simply doesn't. What single instance of conduct have the plaintiffs identified that this court can look at and say, Windermere, on this date you did this, which is an antitrust violation. Not one. Not one single instance. And that's why we went into great detail. Now, as you may recall from the deposition excerpts that we had from Mr. Doug McPherson, we asked him time after time after time, do you have any facts that Windermere fixes prices? And after an objection that that called for a legal conclusion, he answered time after time, it would be my suspicion that they do. Well, do you have any facts? No. That was their answer. When we sent them interrogatories saying, please state the facts upon which you base the allegation that we fixed prices, they objected that it calls for a legal conclusion with preliminary and it would be answered later. And they never did. They don't have one single shred of evidence that Windermere ever violated any antitrust law because Windermere never did. So they can't even meet what this court points out plaintiffs often forget is you have to identify the specific conduct. But there's more. Because the second thing that we have to take a look at is causing injury to the plaintiff. And that's a big one. You just heard Mr. Wilson mention about a dozen times, price-fixing this, price-fixing that. Well, we can price-fix until the cows come home. And Mr. McPherson and the McPherson companies still go home. And the reason they do is because the Supreme Court, this circuit, and just about every other court to look at it has said a competitor cannot sue another competitor for fixing prices at any minimum level. Period. Why? Because if we jack up the Windermere rates, they can only benefit. Which is why Doug McPherson in his deposition, the excerpt is quoted in our brief, says doesn't hurt us any. If Windermere were in fact to restrict its company's market areas, which it doesn't, that would only limit the competition for McPherson companies to compete there. Most of the alleged conduct, even if it took place, could only benefit McPherson either by raising the prices of a competitor or by limiting the degree to which a competitor competed. And this court and the Supreme Court have regularly said if that's the case, you can't get there. So all that talk about damaging people through price-fixing, it doesn't matter. And no amount of discovery, no amount of supplemental filings can change the fact that Windermere and McPherson are competitors. You just can't. Can you address the breach of contract claim? Sure. The breach of contract claim literally came down to this. They came into court and they said, judge, everybody signed a contract. We're sure. And the question was, well, did you see any of the defendants sign a contract? No, but everybody signed a contract. Then in response to requests for admissions, they admitted pending discovery that those folks did not sign those contracts. What do you say? You're talking about a written contract. Excuse me? You're talking about a written contract. Right. Right. Because they were alleging specific terms of a non-compete agreement and a nondisclosure agreement. And so they never alleged that those terms were orally agreed to by the parties. They simply said, hey, guys, we have a written contract and here it is. And we said, well, great, show us a copy if you would. And they said, well, we don't have one. We think you might have stolen it from our corporate offices. We never figured that one out. But what the court ultimately said is you can't come into my court saying there's a contract and my proof is my testimony that everybody signed a contract even though I have no witness of any kind saying that these particular people signed a contract. And I think the court was right on that. Now, the footnote in McPherson's brief says that it's sufficient to prove the essential elements of the contract. And that is, in fact, the test. But the essential element here is some witness saying you, in fact, signed it. Some witness saying you, in fact, did agree to this. So in order for us to prove a contract, we would have to have some witness saying there was mutual agreement to this contract on these terms. You have to have some witness. And there never was. So the court said no. That's not sufficient. But didn't the one, I guess it's Eldridge, didn't she admit in her deposition that she recalled signing the contract? She said there was a contract. She did not say I signed the contract to the best of my knowledge. But shouldn't that one interpret that inference or draw an inference on that that there was a contract? Well, except for the fact that a contract itself can be oral or in writing. She never said I agreed to a contract that contained these terms. Did they ever lay out what they believed the terms of the contract? They did. They provided a couple of different variations of the contract over time. I don't believe it was ever made clear exactly which contract the defendants allegedly signed. And I apologize. Did those contracts have a non-compete clause? The contracts did, in fact, have a non-compete. A non-disclosure. A non-disclosure, yes, that I won't use anything and I won't take customers when I leave. So it didn't have a non-compete in the general sense. It had a non-compete in the sense for the customers that are here. Yes. And it's, you know, as a business tort goes, I don't know. I wasn't myself directly involved because there was different counsel on the contract issues below. So, you know, I apologize for not being as completely up to speed on that. But one of the rules of antitrust injury, of course, is that a business tort like that cannot state a claim for antitrust violation. I mean, that's a separate, stand-alone state law claim. Right. So. Well, the district court ruled on several of this, like this one, for example. And apparently she declined to assert supplemental jurisdiction over some remaining claims. Right. She did. There were just a handful of claims. I believe that the, for example, the breach of contract claims, there were some other individual defendants who did sign the contract. There was no question. They had a copy. So the summary judgment on the contract not being signed was only brought on behalf of the individuals who had not signed a contract. So there were a couple of just peripheral claims left over that the court just said, I'm not going to keep this case in this posture over a claim against three individuals for taking 20 customers. So if I could finish by just commenting briefly. Trade secret. Trade secret claim. On the trade secret claim, the question here, and I recall the hearing and the judge's frustration, is they claim in their brief that we don't disclose anything. And yet, as we pointed out, the very evidence on which they rely shows that they did, in fact, provide a lot of that information. Namely, and most importantly, the information they provided was the address, the rent amount, and the rent and the lease date. And so what McPherson has claimed is, well, there was other information like social security numbers that wasn't provided. And what Judge Peckman asked at the summary judgment hearing and did not get an answer to is, can you tell me why it is that this additional information like a social security number is the trade secret? Isn't the trade secret the property address, the owner, the lease date, and the lease amount? Because isn't that what a competitor would need in order to compete, in order to use the information? In other words, the trade secret only protects information to the extent that it has value. People's social security numbers really doesn't have value to a competing property manager. And so her question was, tell me why it is this information that you claim was not included in the information that was sold to appraisers and anybody else who wanted to buy it was secret, and they couldn't. So, and again, I think that that's a fair statement, and I don't think in their brief that McPherson has made any attempt to say, this is the information that was not sold. They've done that. They've at least made that argument, although I don't think accurately. But they haven't taken the next step to say, and here's why that subset of the information constitutes a trade secret. Here's why knowing the utilities would be so important when the utilities are general to the area. So, no, I don't think that their trade secret claim goes anywhere. So, now, the last thing is, there's been a suggestion that in cases like this, we always ought to wait until the discovery cutoff comes and goes before bringing a motion like this. Needless to say, the rules don't say that. There's been a suggestion that the plaintiff in cases like this needs to be entitled to the broadest discovery, and that's the concern that the Court ought to have. There's another concern that the Court ought to have, and that is there's consequences for being a defendant in a lawsuit like this. There's a consequence for being Windermere. And the consequences are that the press reports it. And when the press reports it, they don't usually call for comments from the defendant. Except in this case, just send them a copy of the complaint, which they didn't have. The banker takes notice when you get sued. It goes in the public offering statement if you're a franchise. Recruited agents hear about it. Your competitor gets to obtain your own internal records. That's what happens in these lawsuits. It's a big distraction for management. And it costs a lot of money. And the longer it goes on, the more it costs. And that's why the motion was brought when it was, after lots of discovery. And that's why we've asked this Court to award Federal Rule of Appellate Procedure 38A damages, because we believe that this appeal has no merit. And the standard for that is really well set forth in the reply brief of appellant, where they say that the appeal is frivolous, it clearly has no merit, and the result is wholly obvious. I'm not going to try to persuade you of that, because if you don't think that now, then it obviously isn't. We believe that it is. At the trial court, there may have been justification for doing it. But at the appeal court, to take the position they have, to rely on the evidence they have, we just don't see it. Thank you, Your Honor. All right. Thank you. Roboto. Thank you. So just briefly, I don't need to explain the antitrust standing issues to this Court, it seems to me. This Court is very familiar, particularly in the Big Bear case, that competitors do have antitrust standing and have suffered antitrust injury to challenge the exclusionary restraints that enforce price fixing. And so the appellee's argument on that ground is unavailing. Second, I note that the appellee's argued that the Court never granted a motion to compel discovery. But, of course, the Court did. That's the Court's record, page 198. The Court granted, this is October 28th, the Court granted the motion to compel discovery. And also to reformat two additional motions that the Court did not feel met the local rules formatting form. And, by the way, that was a new rule, and under the local rules, it's an optional rule. But the next point is, I'm not asking this Court to change any of its authority on the 56F motion, what the Court should consider on the 56F motion. On the summary judgment record, I'm asking this Court to uphold its authority, and particularly that in the fair housing case and that authority in the American ad case. There was a suggestion that Mr. Jackson's testimony was simply his opinion that the appellee's intended to put competing real estate companies out of business, and, in fact, the declaration is in the record and shows that it wasn't his opinion. It was expressly stated by the appellees, along with the boast that they could wipe out any real estate company they wanted to. That was a statement by the appellees. That was not Mr. Jackson's opinion. Also, I note that the conversation occurred in the context of the appellee's pressuring Mr. Jackson to join the Windermere cartel. Next, just very briefly, the contract information is in the record, and each of the two appellees who were granted summary judgment testified that they admitted they did have the sales associate agreement. One said, yes, there is a contract. And that creates, at minimum, an issue of fact of whether there is a contract. Finally, I should conclude by simply saying that all of the real estate antitrust cases, the Sixth Circuit's Remax case, the Fifth Circuit's El Paso case, and the Minneapolis case, as well as this Court's recent decision in Freeman, all support the appellant's antitrust injury and antitrust standing. Thank you. All right. I thank both counsel for your argument. This case is now submitted for decision. The next case on the argument calendar is Saunders v. the United States. Thank you.
judges: Hug, Tashima, Paez